**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

SHARON ROGERS,                             :

                                 Case No. 3:10-cv-229

              Plaintiff,

                                 District Judge Timothy S. Black
                                 Magistrate Judge Michael R. Merz

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.          :

### REPORT AND RECOMMENDATIONS

        Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

        Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).  Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff protectively filed applications for SSD and SSI on August 7, 2002, alleging disability from December 31, 1992, due to sleep apnea, asthma, bronchitis, and allergy problems. See Tr. 62-64; 87.  The Commissioner denied Plaintiff's applications initially and on reconsideration. See Tr. 38-41; 43-45. Administrative Law Judge Melvin Padilla held a hearing, (Tr. 711-48), following which he determined that Plaintiff was not disabled. (Tr. 442-58). The Appeals Council granted Plaintiff's request for review and remanded the matter for further proceedings. (Tr. 459-61).

On remand, Judge Padilla held a hearing, (Tr. 749-85), following which he determined that Plaintiff was not disabled before December 28, 2006, but that she became disabled beginning December 28, 2006. (Tr. 16-26). The Appeals Council denied Plaintiff's request for review, (Tr. 8-10), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff was not disabled before December 28, 2006, Judge Padilla found that she met the insured status requirement of the Act through March 31, 1998. (Tr. 19, ¶ 1). Judge Padilla then found that Plaintiff had severe obesity and mild lung disease through the date last insured and that since the date of her SSI application, she had the severe obesity, multiple arthralgias likely secondary to obesity, and mild degenerative changes in the cervical and lumbar spines, history of left carpal tunnel syndrome, obstructive sleep apnea, restrictive and obstructive lung disease, dysthymic disorder, generalized anxiety disorder, and mixed personality disorder.  *Id.*, ¶ 3.  Judge Padilla also found that Plaintiff does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 21, ¶ 4). Judge Padilla found

further that Plaintiff has the residual functional capacity to perform a limited range of light work. *Id.*, ¶ 5. Judge Padilla then used sections 202.18 (ages under fifty) and 202.11 (ages fifty to fifty-four) of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 25, ¶ 10). Judge Padilla also used section 202.02 (age fifty-five and over) of the Grid and found that Plaintiff is disabled at attaining age fifty-five. *Id.* Judge Padilla concluded that Plaintiff was not disabled prior to December 28, 2006, but that she became disabled as of that date. (Tr. 26).

Plaintiff does not take issue with Judge Padilla's review of the medical evidence nor with the Commissioner's review contained in his Memorandum in Opposition [to Plaintiff's Statement of Errors]. (Doc. 8, 14). The Court therefore adopts the Commissioner's review:

### 1. Physical Impairments

Plaintiff has a history of sleep apnea and obesity. In August 2001, Dr. Castaldo evaluated Plaintiff for abnormal blood gases and shortness of breath (Tr. 224). Dr. Castaldo noted that Plaintiff was 5 feet 3 inches tall and weighed 325 pounds (Tr. 225). Dr. Castaldo believed Plaintiff's history suggested narcolepsy, not obstructive sleep apnea, but it was unclear to him whether Plaintiff's obesity caused her to sleep poorly or her poor sleep caused her to be fatigued, which facilitated her obesity (Tr. 225). Dr. Castaldo recommended a sleep test (Tr. 225).

Plaintiff was treated occasionally by Dr. Bartnick, a family physician, from December 1999 through December 2003 for ... general complaints, including elevated blood pressure, asthma symptoms, sleep apnea, fatigue, and "confusion" (Tr. 257-86). In December 2003, Dr. Bartnick diagnosed Plaintiff with an acute upper respiratory infection after Plaintiff complained of extreme shortness of breath and an inability to walk far or stand for long (Tr. 416). Plaintiff alleged that she could not lift even 10 pounds, and she stated that she could not bend over or crawl (Tr. 416).

Medical records from Dr. Graham dated March 2002 through July 2004 show that Plaintiff had sleep apnea (Tr. 344-57). Plaintiff was given a CPAP machine, which helped with her sleep apnea (Tr. 352-53). Dr. Graham noted that a pulmonary function study "just showed moderate restrictive impairment," which suggested that her pulmonary impairment was not the cause of Plaintiff's alleged fatigue (Tr. 352). In August 2002, Plaintiff informed Dr. Bartnick that she had undergone sleep testing and was sleeping "much better" after having a CPAP machine installed at her home (Tr. 228). Plaintiff underwent a sleep study in October 2002 while using the CPAP machine, and the testing results fell within the normal range (Tr. 350).

On January 8, 2003, Dr. Danopulos physically examined Plaintiff at the request of the state agency. Plaintiff complained of shortness of breath, left hip pain, hypertension, and being overweight (Tr. 233). Plaintiff also stated that she had a history of headaches, but these diminished when she began using the CPAP machine (Tr. 233). Dr. Danopulos noted that Plaintiff was 5 feet 3 inches tall and weighed 333 pounds (Tr. 235). Dr. Danopulos observed that Plaintiff had a normal gait, including both heel and toe walking, got on and off the examination table without difficulty, dressed and undressed normally, and otherwise moved without problems (Tr. 235-36). Plaintiff had normal range of motion in her upper and lower extremities, and there was no evidence of joint abnormalities (Tr. 235). Plaintiff also had normal motor strength in her upper and lower extremities (Tr. 236). Plaintiff had restricted motion in her left hip, but a left hip x-ray was normal (Tr. 236). Dr. Danopulos also found Plaintiff's blood pressure was "well controlled" (Tr. 236). Dr. Danopulos diagnosed Plaintiff with emphysema with prominent restrictive lung disease triggered by Plaintiff's morbid obesity, sleep apnea, left hip arthralgias, well-controlled hypertension, and unusual morbid obesity that did not allow her to move around properly (Tr. 236). Dr. Danopulos stated that Plaintiff's ability to do any work activity was "restricted," but did not provide more specific limitations. (Tr. 236).

On February 24, 2003, Dr. Morton reviewed Plaintiff's medical record and provided a physical RFC assessment. Dr. Morton found that Plaintiff was physically capable of performing light work,...but she should only occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl, never climb ladders/ropes/scaffolds, and should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 291-94). Dr. Morton indicated that Plaintiff's alleged symptoms were only "partially credible" (Tr. 294). Dr. Perencevich

reviewed and affirmed Dr. Morton's assessment in September 2003 (Tr. 295).

X-rays of Plaintiff's cervical spine taken in October 2003 showed spondylosis of the lower cervical spine and slight degenerative changes (Tr. 342). X-rays of Plaintiff's right wrist taken at this time were normal (Tr. 342).

In December 2003, Dr. Bartnick opined in a report for the Rehabilitation Services Commission that Plaintiff was incapable of performing even sedentary work (Tr. 417-19). Dr. Bartnick stated that Plaintiff was not capable of standing/walking for any amount of time and could not lift any weight, even occasionally (Tr. 418). In April 2004, Plaintiff followed up with Dr. Bartnick and indicated to him that the "main thing is that she is look at gaining disability" (Tr. 413). Plaintiff complained of shortness of breath, shoulder, back, and hip pain, depression, and a learning disability (Tr. 413). Dr. Bartnick indicated that he had received disability forms from Plaintiff's attorney, but he could not fill these forms out because "[t]here [was] no proof of disability," and Dr. Bartnick noted that Plaintiff had not seen a specialist at that point (Tr. 413). Dr. Bartnick diagnosed her with shortness of breath, arthralgia at multiple sites, and a possible learning disability (Tr. 413).

In May 2004, Plaintiff followed up with Dr. Graham and reported no improvement in daytime sleepiness or sleep quality, despite use of the CPAP machine (Tr. 345). Dr. Graham was unsure whether Plaintiff's sleep problems were more related to sleep apnea or Plaintiff's alleged depression (Tr. 345).

On April 30, 2004, an x-ray of Plaintiff's right shoulder showed osteoarthritis of the AC joint, and an x-ray of her left shoulder showed calcific bursitis (Tr. 340). X-rays of Plaintiff's hips showed no abnormalities (Tr. 341). An x-ray of her thoracic spine revealed spondylosis of the mid and lower thoracic spine (Tr. 341).

Dr. Scott at the Center for Sports Medicine began treating Plaintiff for "very generalized aches and pains" in May 2004 (Tr. 366). Dr. Scott reviewed Plaintiff's April 2004 x-rays and physically examined Plaintiff (Tr. 367). Plaintiff exhibited reduced strength in all muscle groups, but Dr. Scott remarked that she was "not sure if some of this [was] due to poor effort" (Tr. 367). Plaintiff had decreased range of motion in her lumbar spine, but she demonstrated full range of motion in her cervical spine and with intact sensation (Tr. 367). Dr.

Scott diagnosed Plaintiff with cervicothoracic strain, lumbosacral strain, degenerative disc disease of the thoracic and cervical spine, morbid obesity, and postural imbalance (Tr. 367). Dr. Scott recommended physical therapy, a nutritional consultation, and pain medication (Celebrex) (Tr. 367). Plaintiff underwent physical therapy in May and June 2004 and had a consultation with a nutrition specialist in May 2004 (Tr. 333-37). An x-ray of Plaintiff's lumbosacral spine showed "mild" arthritic changes on June 16, 2004 (Tr. 338).

A July 2004 EMG indicated that Plaintiff had "moderate to severe" left carpal tunnel syndrome (Tr. 360). On July 16, 2004, Dr. Scott gave Plaintiff an injection in her wrist and a wrist splint (Tr. 361). In January 2005, Plaintiff informed Dr. Bartnick that she was doing "much better" with her sleep apnea after using the CPAP machine (Tr. 412). Plaintiff also stated that counseling seemed to be helping with her mental problems (Tr. 412). Dr. Bartnick noted that Plaintiff had undergone surgery for carpal tunnel syndrome in her left hand and "she is doing better" (Tr.412). Plaintiff also informed Dr. Bartnick that she was "not nearly as depressed as in the past," but anxiety continued to be a problem (Tr. 411). Plaintiff continued to complain of back and hip pain (Tr. 412). Dr. Bartnick diagnosed Plaintiff with arthralgia of the hip, anxiety/depression, and hypertension (Tr. 411). In March 2005, Dr. Bartnick also diagnosed Plaintiff with acute sinusitis (Tr. 407-08).

In January 2006, Plaintiff went to the emergency room after experiencing chest pain for the past three days (Tr. 510). A stress test was negative and Plaintiff's chest pain was found to be "not of cardiac origin," but most likely a symptom of her sleep apnea or anxiety (Tr. 510). Plaintiff was discharged in fair condition and instructed to use her CPAP machine and follow up with Dr. Bartnick in seven to 10 days (Tr. 511).

Plaintiff underwent a pulmonary function test on January 10, 2006 (Tr. 635). The test showed that she had a "moderate" pulmonary obstruction, but with a significant response to medication (bronchodilators) (Tr. 635). An echocardiogram on January 17, 2006 was largely normal, as Plaintiff had an ejection fraction of 60%-65%... (Tr. 634).

Plaintiff next went to the emergency room on August 24, 2006, with complaints of low back pain for the past three weeks (Tr. 523). Medical personnel found no evidence of lumbar radiculopathy, and

8

Plaintiff had full motor strength (Tr. 524-25). Plaintiff was diagnosed with an acute lumbar strain, given medication, and discharged (Tr. 525).

In November and December 2006, Plaintiff underwent surgery to remove a benign mass from her pelvis and to repair an umbilical hernia (Tr. 530-31). Plaintiff's pelvic wound became infected and was slow to heal, but the record shows Plaintiff expressed no further complications with this wound (Tr. 536, 552-53, 578).

Chest x-rays taken on October 17, 2006 were "essentially unremarkable" (Tr. 613). A pulmonary function study on the same day revealed a "mild" obstructive impairment (Tr. 611). Plaintiff was noted to weigh 335 pounds (Tr. 611).

### 2. Mental Impairments

On August 25, 2003, Dr. Boerger performed a mental examination of Plaintiff at the request of the state agency. Plaintiff stated that she had last worked from 1992 to 1993 as an inspector (Tr. 297). However, she lost this job because of a reduction in force, although she believed the real reason was that her current husband was her boss (Tr. 297). Plaintiff did not have a history of mental health treatment (Tr. 297). Plaintiff alleged that she had difficulty with depression, anxiety, and crying spells, and only slept for one hour a day (Tr. 298-99). Dr. Boerger found that Plaintiff's affect, speech, and thought processes were appropriate, and she was alert and oriented to time, place, and person (Tr. 298-99). Dr. Boerger indicated that Plaintiff's MMPI-2 personality test results, which showed depressed mood, hostility, irritability, and emotional liability, "may be invalid" because "[e]xaggeration of symptoms [was] likely" (Tr.300). Dr. Boerger diagnosed Plaintiff with dysthymic disorder, anxiety disorder, and mixed personality disorder with avoidant, dependent, histrionic and borderline features. Dr. Boerger assigned Plaintiff a Global Assessment Functioning ("GAF") score of 49 (Tr. 301). Dr. Boerger opined that Plaintiff was: moderately to markedly impaired in her ability to relate to others; mildly to moderately impaired in her ability to understand and follow instructions; moderately to markedly impaired in her ability to perform simple, repetitive tasks; and markedly impaired in her ability to withstand work stress and pressure (Tr. 301-02).

On September 12, 2003, Dr. Casterline provided a mental RFC assessment after reviewing Plaintiff's medical record, including Dr.

9

>Boerger's findings. Dr. Casterline found Plaintiff was "[n]ot significantly limited" in 15 of 20 work-related mental categories and "[m]oderately limited" in the remaining five categories (Tr. 304-05). Dr. Casterline opined that Plaitniff would be able to relate adequately in superficial actions, tolerate routine changes in job duties or circumstances, follow instructions, and make decisions (Tr. 306).
>
>Plaintiff saw Ms. Carner, a social worker, occasionally from March 2004 through June 2004. On May 12, 2004, Ms. Carner noted that Plaintiff was relaxed and improving (Tr. 378). At this time, Plaintiff indicated that her family believed she was "doing a lot better" (Tr. 378). In June 2004, Plaintiff was concerned about an upcoming court appearance and indicated that she could not always afford her medication (Tr. 375). In August 2004, Ms. Carner opined that Plaintiff has poor or no ability to: remember work-like procedures, understand and remember very short and simple instructions, maintain attention for two hour segments, work in coordination or proximity to others without being distracted, complete a normal workday or work week without psychologically based interruptions, and perform at a consistent pace (Tr. 372-73). Ms. Carner believed Plaintiff's other work-related mental abilities in all other functioning categories were "fair" (Tr. 372-73).
>
>...
>
>Dr. Boyce, a medical expert, ... testified at the administrative hearing after reviewing Plaintiff's medical record and listening to her testimony. Dr. Boyce stated that he did not find any basis for Plaintiff's use of oxygen in the record (Tr. 774). Dr. Boyce believed Plaintiff's breathing difficulties were primarily impacted by her weight, although there was also an element of de-conditioning involved (Tr. 774). Dr. Boyce stated that Plaintiff did not meet any Social Security Listings, and the only severe impairment present prior to Plaintiff's date last insured, March 31, 2998, was obesity (tr. 774). Dr. Boyce opined that Plaintiff would be able to stand/walk for a maximum of two hours each day and sit for at least six to seven hours daily, but she would need to change positions (tr. 774-75). Dr. Boyce agreed with the state agency physician's finding that Plaintiff should not life more than 20 pounds occasionally and ten pounds frequently (Tr. 775). Plaintiff had no work-related limitations prior to her date last insured, according to Dr. Boyce. (Tr. 775).

(Doc. 13, PageID 63-72).

In her Statement of Errors, Plaintiff alleges that the Commissioner erred by: (1) failing to fully and fairly evaluate her diagnosis of obesity; (2) failing to properly consider the symptoms of her mental impairment; (3) ignoring the testimony that she needs to nap as much as she finds necessary and to elevate her legs whenever she sits; (4) relying on the reviewing experts' opinions; (5) finding she is capable of performing light work; (6) relying on an unintelligible audio recording of the hearing; and (7) "picking and choosing" information and medical records out of context to support his findings. (Doc. 8). Plaintiff has essentially listed her allegations seriatim and has provided no citations to the record to support her allegations. *Id.*

In support of her first Error, Plaintiff argues that she is morbidly obese as evidenced by her medical records and pictures and Judge Padilla merely considered her overweight. Plaintiff argues that if the obesity Listing were still in effect, she would satisfy that Listing and that the Commissioner failed to properly consider her obesity in accordance with SSR 00-3P.

First, as Plaintiff acknowledges, the obesity Listing was deleted in 1999. 64 FR 46122 (Oct. 25, 1999). Therefore, whether Plaintiff satisfies the deleted Listing is irrelevant to her claim. Second, while Plaintiff relies on Social Security Ruling ("SSR") 00-3P in support of her position, SSR 00-3P was superseded by SSR 02-1p, 2000 WL 628049 (Sept. 12, 2002). Nevertheless, a review of Judge Padilla's decision reveals that he did not fail to properly consider Plaintiff's obesity.

The Court notes that Judge Padilla noted Plaintiff's obesity throughout his decision and, in fact, determined that it is a severe impairment. *See, e.g.,* Tr. 19, 21, 22. There is nothing in the record that indicates that the physicians who evaluated Plaintiff's residual functional capacity, including the reviewing physicians, failed to consider Plaintiff's weight in opining as to her abilities.

Moreover, Plaintiff has failed to point to any evidence which indicates that her obesity causes limitations beyond those which the Commissioner identified. In contrast, Judge Padilla noted that Dr. Danopulos reported that although Plaintiff weighed three-hundred thirty-three pounds, she had a normal gait, was able to heel and toe walk, moved without difficulty, and got on and off the exam table without difficulty. (Tr. 235-36; 446).

Under these facts, the Commissioner did not fail to properly consider Plaintiff's obesity.

Plaintiff argues next that the Commissioner erred by failing to properly consider the symptoms of her mental impairment. In support, Plaintiff relies in part on Dr. Boerger's opinion and Ms. Carner's opinion.

In his opinion on remand, Judge Padilla explicitly incorporated his earlier opinion. (Tr. 20) in which he rejected Dr. Boerger's opinion and Ms. Carner's opinion. (Tr. 451-52). Plaintiff does not argue in her Statement that Judge Padilla improperly rejected Dr. Boerger's and Ms. Carner's opinions. (Doc. 8, PageID 45-48). However, in her Reply Plaintiff alleges that Judge Padilla simply disregarded those opinions without considering other evidence such as the fact she was seeking mental health treatment and was taking an ant-depressant which her family doctor prescribed.

In rejecting Dr. Boerger's opinion, Judge Padilla noted that the doctor's opinion was inconsistent with his findings. (Tr. 451). Specifically, Judge Padilla noted that although Dr. Boerger determined that Plaintiff was moderately to markedly impaired, the results of the MMPI which he administered indicated that "exaggeration of symptoms is likely" and that "the profile is likely to be of very doubtful validity." *Id.*; *see also,* Tr. 300. Additionally, Judge Boerger's opinion

is inconsistent with the reviewing mental health experts' opinions. (Tr. 303-32). The Commissioner had an adequate basis for rejecting Dr. Boerger's opinion. *Cf., Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994)(the weight accorded to a physician's opinion is dependent on whether it is well supported by medically acceptable clinical and laboratory techniques and whether it is inconsistent with the other substantial evidence in the record).

With respect to Ms. Carner, a social worker, Judge Padilla noted that she is not a professional mental health source of any kind and is not an acceptable medical source. (Tr. 452). That finding is consistent with the Regulations. 20 C.F.R. §§ 404.1513, 416.913.

Under these facts, the Commissioner did not err in evaluating Plaintiff's alleged mental impairment.

Plaintiff argues that the Commissioner erred by ignoring testimony that she needs to nap as much as she finds necessary and that she must elevate her legs whenever she sits. However, Plaintiff has failed to point to any medical evidence whatsoever which supports her position. In the absence of such evidence, the Commissioner was not required to give any weight to Plaintiff's allegations of needing to nap at will and to elevate her legs whenever she sits.

Plaintiff's next argument is essentially that the Commissioner erred by rejecting Dr. Boerger's and Ms. Rogers' opinions and relying instead on the reviewing experts' opinions. However, as noted above, the Commissioner had adequate bases for rejecting Dr. Boerger's and Ms. Rogers' opinions.

In her next challenge to the Commissioner's decision, Plaintiff alleges that the Commissioner erred by finding she is capable of performing light work because he ignored SSR 83-10. SSR 83-10, 1983 WL 31251 (1983), addresses "the manner in which the medical-vocational

13

rules in Appendix 2 of Subpart P, Regulations No. 4, [the Grid] address the issue of capability to do other work, and to provide definitions of terms and concepts frequently used in evaluating disability under the medical-vocational rules." As noted above, however, for the period prior to Plaintiff's fifty-fifth birthday Judge Padilla merely used the Grid as a framework for deciding. Therefore, the definitions contained in SSR 83-10 are not applicable. To the extent that Plaintiff's position is that the Commissioner erred by failing to include in his hypothetical question to the VE the light work requirement of standing for six hours in a workday, that argument is meritless. The Commissioner's hypothetical question to the VE included the ability to perform light work with the need to alternate positions every fifteen to thirty minutes. (Tr. 779-80; *see also,* Tr. 743). There is no inconsistency between being able to perform the light work requirement of standing for six hours and the requirement of alternating positions every fifteen to thirty minutes.

Plaintiff's next argument seems to be that the Commissioner's decision should be reversed because the audio tape of the hearing is unintelligible at times and therefore she cannot tell how the VE reached his conclusion as to the jobs he identified. While that may be an accurate description of the audiotape which the Commissioner provided to Plaintiff, the record contains full transcripts of the hearings which Judge Padilla held. (Tr. 711-48; 749-85). There is no indication in either transcript that the transcriber had any difficulty hearing or understanding any portion of the testimony at either hearing. Indeed, the Commissioner provided Plaintiff with the hearing transcripts and those transcripts comprise the official record.

Plaintiff's final argument is that the Commissioner "picked and chose" information and record evidence out of context to support his predetermined decision to deny her application and ignores evidence and records which do not support that decision. The only evidence Plaintiff points

14

to is Judge Padilla's misstatement of the GAF score Dr. Boerger assigned to Plaintiff.  In his decision, Judge Padilla referred to the GAF score which Dr. Boerger assigned to Plaintiff as 51. (Tr. 451).  However, in his report, Dr. Boerger assigned Plaintiff a GAF of 49. (Tr. 301).  While Judge Padilla clearly misstated the GAF score, his error is harmless because, as noted above, he had an adequate basis for rejecting Dr. Boerger's opinion.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982).  The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939).  The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

March 23, 2011.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).